■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ANTONIO SANTANA, Appellant. — Judgment of conviction, Supreme Court, New York County (Leff, J.), rendered August 24, 1979, modified, on the law, to remand that portion of the verdict of the jury finding defendant-appellant guilty of sodomy, first degree, to Supreme Court, New York County, for sentence on that count, and otherwise affirmed. After sentencing defendant on the felony murder count, the court, stating that the predicate sodomy count was a lesser included count of felony murder, ruled that "there will be no sentence imposed on that count." It is not a lesser included count, and we remand for sentence accordingly. (See *People v Cagle,* 70 AD2d 573; *People v Nichols,* 230 NY 221.) This sordid case involves a gang-sodomy performed on a 22-year-old girl, who was then hanged by the group of six, including defendant, who had perpetrated the crime. The sole eyewitness was 16-year-old Juan Encarnacion, homosexual subservient lover of the dominant and older member of the pair, defendant Santiago (to be distinguished from Santana, this defendant-appellant). As noted in the dissent, Encarnacion, for whatever reason, told a bizarre story of his relationship with Santiago, stating that he had been held captive in the abandoned building, scene of the crime, for three months, and forced to undergo homosexual contact with Santiago. Whether the jury chose to accept this part of the witness' testimony or perhaps chose to explain the dominance of Santiago over the younger person as homosexual thralldom, the fact is that the jury did believe the witness as to the circumstances of the murder, and there is no basis to set the verdict aside. The jury decided a sheer issue of credibility. The trial court was correct in refusing to charge the jury as to the

possibility of Encarnacion's having been an accomplice.[1] There was not a scintilla of evidence in his testimony to provide a basis for such a finding, and there was no other evidence whatever to support it. The dissent invites us to speculate that, merely because "Encarnacion had voluntarily accompanied Santiago on that date [when the latter went to find something with which to hang the victim], then they could have reasonably believed that he voluntarily went with Santiago in search of a cord to hang the decedent." This is not alone to invite the jury to draw an inference from an inference, but it does not admit at all of consideration of proof of intent on the part of the alleged accomplice — of which there is none whatever. The evidence was that Santiago said to his codefendants, as he left them to procure a means of committing the hanging, nothing more than "Wait here. I'll be back." He did not state the purpose for which he left them. The mere fact that, against the quoted verbal background, Encarnacion went with Santiago, does not carry an inference of complicity. Nor was such a thought conveyed by the statement by one of the participants to the effect that they could not leave the victim alive. Not even the excerpt in the dissent from Encarnacion's cross-examination carries an implication that he had previous knowledge of Santiago's purpose; that answer was given, after all, at the trial, by which time — indeed, from the time the girl had been hanged — he had to have gained knowledge of the purpose effectuated by going downstairs. There is nothing in any of Encarnacion's answers to indicate that this particular accompanying of Santiago had any motivation except his usual one, to be with his lover. Moreover, the dissent seems to imply that, even in the absence of evidence that Encarnacion had the requisite intent to be charged with complicity, the jury might have been able to infer from absence of evidence of lack of intent on Encarnacion's part that actually he had such intent. This is not permissible. "The evidence in this case consequently does not support the inference that the sale was made to the underage minor. The rule is stated in Corpus Juris Secundum (32 C. J. S., Evidence, § 1021 [b], pp. 1053-1054): 'A conclusion of fact may be legitimately drawn from a preponderance of probabilities in its favor; conversely, the existence of a fact is not established by evidence which does not render its existence more likely than its nonexistence. The probabilities must be such that the conclusion is acceptable to the judgment of the court or jury applied to the evidence in the particular case; mere proof of possibility, or even a preponderance of possibilities or a majority of chances, never can suffice alone to establish a proposition of fact.' *** There is a similar application of the rule in criminal cases, but of course under more rigorous supervision. (See, e.g., *People* v. *Di Landri,* 250 App. Div. 52, decided with reference to facts not affected by the enactment of section 1898-a[2] of the Penal Law, in which it was held that presence of a pistol in an automobile occupied by defendant and others did not justify an inference that defendant owned or had constructive possession of the weapon.)" *(Matter of Erin Wine & Liq. Store v O'Connell,* 283 App Div 443, 446.) (See, also, 32A CJS Evidence, § 1021, p 651 *et seq.;* 22 NY Jur 645, p 155.) The conviction should be affirmed. Concur — Birns, Ross and Markewich, JJ.

Murphy, P. J., dissents in a memorandum as follows: The first issue presented is whether defendant Santana preserved for review the trial court's purported error in failing to give an "accomplice" instruction under CPL 60.22. Defendant Antonio Santana was jointly tried with codefendants Sam Gonzalez and Nector Rios. Prior to the jury selection, there was a colloquy between the

1. For our purposes we shall not be detained by the issue of whether exception was properly taken as to this claimed error. We accept the argument that one counsel had acted for all in his request to charge, and that his request inured to appellant's benefit.
2. Now section 265.15 of the Penal Law.

trial court and the three defense attorneys. The discussion centered upon matters directly relating to the trial. For example, Assistant District Attorney Payne agreed to turn over later that same day the Grand Jury minutes and a list of prosecution witnesses. The court directed that daily copies of the trial minutes be prepared. It further ruled that the defendants' criminal histories could not be introduced at trial. At the end of the colloquy, the following exchange occurred between Mr. Rosner, the attorney for Gonzalez, and the court: "MR. ROSNER: Judge, may we have it stipulated that if one lawyer makes an objection, shall hold for the benefit of other counsel? THE COURT: If it's appropriate, yes." There can be no dispute that this stipulation was ambiguous. Nonetheless, since the prior discussion related to the course and conduct of the trial, the stipulation must be viewed as one pertaining to objections (or exceptions) that might be made by only one of the three attorneys at trial. Moreover, in a proceeding where defendant Santana has received a sentence of 25 years to life, any ambiguity in the stipulation should be resolved in his favor. At trial, there was no consistent pattern of objections. One, two and, sometimes, three attorneys objected to particular points. The important fact would seem to be that in certain situations two of the defense attorneys left it to their associate to raise an objection to a point affecting each of their clients. Thus, it cannot be validly said that the trial was conducted in such a manner as to indicate that the defense attorneys were ignoring the pretrial stipulation or that the stipulation had been abandoned. To avoid unnecessary repetition and delay at a joint trial involving three defendants, the practicalities of the situation and judicial economy frequently cause two defendants to rely upon the lead taken by the third defendant. In this proceeding, codefendant Gonzalez submitted several written requests to charge which included an "accomplice" instruction. The trial court denied, *inter alia*, the request to give an accomplice instruction. Although counsel for defendant Santana did not except to the charge because an "accomplice" instruction had not been given, the same may be said for the attorney for codefendant Gonzalez. The reason that none of the three attorneys excepted to the court's failure to give an "accomplice" instruction was the fact that error had been already preserved by the court's failure to so charge in accordance with Gonzalez' request (CPL 470.05, subd 2). In a criminal proceeding of such a serious nature, defendant Gonzalez' attorney submitted 44 requests to charge. Inexplicably, the attorneys for Santana and Rios did not submit one written request on the "accomplice" instruction or otherwise. There is no reason to believe that those two attorneys in this murder case were so derelict in their duties that they did not make one written request, or were so incompetent that they believed no request was needed. As was mentioned above, the practicalities of this joint trial strongly suggest that they joined in the requests of codefendant Gonzalez. Moreover, defendant Santana did not receive any apparent benefit or tactical advantage from the omission of the "accomplice" instruction. To the contrary, it was in Santana's best interest to compel the jury to find corroborative evidence under CPL 60.22. For these reasons, the conclusion must be drawn that Mr. Levitas, the attorney for defendant Santana, relied upon and joined in the written requests submitted by the attorney for codefendant Gonzalez. The second issue presented is whether the trial court should have charged that a question of fact was presented as to whether the prosecution's "star" witness, Encarnacion, was an accomplice of defendant Santana under CPL 60.22. In its most recent pronouncement in this area *(People v Berger,* 52 NY2d 214, 219), the Court of Appeals has observed that: "It is important to emphasize that the corroboration statute's definiton *[sic]* of an accomplice differs significantly from the Penal Law section that provides for accomplice criminal liability (Penal Law, § 20.00). Indeed, this court has previously recognized that CPL 60.22 broad-

ened the definition of an accomplice 'in order to provide a more equitable, operable and consistent standard for the courts in determining when the requirement of corroboration is applicable' *(People v Basch,* 36 NY2d 154, 157, quoting *People v Beaudet,* 32 NY2d 371, 378). Thus, even though a witness is not liable criminally as an accomplice for the offense being tried, the witness may be an accomplice for corroboration purposes if he or she may reasonably be considered to have participated in an offense based upon *some* of the same facts or conduct which make up the offense on trial. Significantly, the proof need not show the participation of the witness beyond a reasonable doubt; it is sufficient if the witness may reasonably be considered to have participated. And, of course, the witness need not be actually charged with any offense to be deemed an accomplice (see, e.g., *People v Basch,* 36 NY2d 154, 157-158, *supra).*" Encarnacion had maintained at trial that he was Santiago's prisoner and lover for a three-month period. The defense witnesses introduced evidence tending to show that Encarnacion voluntarily stayed with Santiago. Thus, a sharp question of fact was presented to the jury as to whether Encarnacion had acted under duress when he accompanied Santiago to the murder scene on the date of the occurrence. If the jury believed that Encarnacion had voluntarily accompanied Santiago on that date, then they could have reasonably believed that he voluntarily went with Santiago in search of a cord to hang the decedent. Upon cross-examination, Encarnacion was asked the following question and he gave the following answer: "Q. But after Orlando [Santiago] said that you got to do something about that girl, can't leave her alive, he and you went down to the other apartment and looked for a rope? A. Yes." Based upon the foregoing testimony, the jury could have reasonably concluded that Encarnacion participated in the murder or facilitated it. *(People v Berger, supra.)* It should be emphasized that Encarnacion testified that, after the murder, he advised Santiago to go to the police and blame Rodriguez. Encarnacion asserted that he had devised this scheme to free himself from Santiago. However, when they did go to the police, Encarnacion eventually blamed Rodriguez. One may speculate as to the reason for Encarnacion's reluctance to tell the truth and free himself from Santiago's bondage. This particular portion of the testimony is recounted simply to stress the fact that the jury could reasonably infer that Encarnacion's assistance to Santiago started before rather than after the murder. The record presents a most gruesome account of the murder of a young girl. Nonetheless, in view of the "star" witness' dubious character and questionable veracity, the court must be most circumspect in determining whether the "accomplice" instruction should have been given. Upon this record, such a charge should have been given as a matter of law. If the judgment of conviction were not reversed, on the law, then it should be reversed, as a matter of discretion in the interest of justice under CPL 470.15 (subd 3, par [c]) since the evidence raised a critical question of fact as to whether Encarnacion was an accomplice and the trial court should have charged accordingly.