THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v HENRY HOPPER, Appellant.

First Department, June 2, 1982

### APPEARANCES OF COUNSEL

*Kevin B. Hurley* of counsel (*Peter D. Coddington* with him on the brief; *Mario Merola, District Attorney*, attorney), for respondent.

*Frederick Seligman* for appellant.

### OPINION OF THE COURT

ASCH, J.

On December 28, 1978, at about 11:00 P.M. inside Rohan's Bar located at Webster Avenue and 197th Street in The Bronx, four or five men engaged in a fight. During this fracas, one Renaldo Lozado was stabbed in the abdomen. Lozado ran a short distance from the bar and collapsed on the sidewalk in front of his home. He died shortly thereafter in the hospital.

Although there were many people in the bar at the time of the incident (at least 15 to 20), when the trial took place only one eyewitness, Thomas Halley, testified. While Thomas Halley had given a statement to an Assistant District Attorney on December 29, 1978, he had not been

called to testify before the Grand Jury which voted the indictment against the defendant Henry Hopper. Another eyewitness to the event did testify before the Grand Jury, one Freddy Olivencia. His Grand Jury testimony was, *inter alia,* that there had been a fight inside the bar and that the defendant Henry Hopper stabbed Lozado while Lozado was being held by Thomas Halley and Thomas' brother Martin.

The People had intended to call Freddy Olivencia at the trial but Olivencia refused to testify unless he was first relocated and put into a drug program. Mr. Olivencia agreed voluntarily to go to a motel overnight. The court adjourned the trial until the following day. The next morning the prosecutor reported that the witness, although then accompanied by two detectives, had absconded. Olivencia was subsequently located that afternoon. However, he was not called by the People as a witness because while in the District Attorney's waiting room, he went into convulsions and was taken to Lincoln Hospital.

After a continuance had been granted and in the absence of the defense attorney, the Assistant District Attorney approached the Judge in the robing room and requested a material witness warrant and order for Thomas Halley. In support of this application, the prosecutor recited the statement Mr. Halley had given the day following the stabbing, in which he had stated that Henry Hopper had stabbed Mr. Lozado. In addition, it was asserted that Mr. Halley had ignored a subpoena demanding his appearance and a detective had been unable to locate him at his home and at his place of employment. At the same time the prosecutor told the court, all in the absence of defense counsel: "The People feel that Mr. Halley, who is a friend of Mr. Hopper, whose brother [Martin Halley] could factually have been a defendant, *as this witness* [Thomas Halley], that part of Mr. Olivencia's Grand Jury testimony was that Mr. Halley, Thomas Halley, and his brother, were holding Mr. Lozado when Mr. Hopper stabbed him."

The court signed the material witness papers and Thomas Halley was arrested that night, arraigned and furnished counsel. On January 16, 1980, at a hearing held in the robing room, to determine if Mr. Halley should be adjudged a material witness, the court excused defense

counsel on the ground it felt that appellant Hopper had "no standing" to be present at the hearing. Appellant's counsel took exception to this ruling. Halley's appointed counsel, Mr. Russo, thereupon asked for an adjournment of Halley's testimony to the next day. Mr. Russo also stated that he had reviewed the statement given to the District Attorney and had doubts about its "veracity". Mr. Russo had spoken to Mr. Halley, who informed him that both he and his brother had become involved in the barroom fight, and that he may have become thereby an "accessory" in the homicide. Consequently, Mr. Russo sought in exchange for Thomas Halley's testimony, immunity as to any "previous perjuries" and any "implication" in the homicide. After extended discussion, it was agreed to give Thomas Halley immunity from "obstruction of government operations".

Upon the trial, Thomas Halley testified that he witnessed appellant stab the deceased; that about three or four people were involved in the fight; that he was not involved in the stabbing; and that his brother Martin was near a telephone booth when Lozado was stabbed. Appellant contends that the prosecutor encouraged this "patently suspect testimony" and neither brought to the attention of the jury that he was in possession of sworn testimony indicating that Thomas Halley's testimony was perjurious, nor did he bring the matter to the attention of appellant's attorney who might have been able to explore the matter in depth.

The facts presented upon this appeal lead to the inescapable conclusion that appellant was deprived of a fair trial by the failure to advise him of the Grand Jury testimony of Freddy Olivencia. In all fairness to the prosecutor, we must point out that he did submit the issue to the Trial Judge who, however, deemed it unnecessary to make disclosure of this testimony to the appellant.

Initially, we note that CPL 240.45 (subd 1, par [a]) states:

"1. After the jury has been sworn and before the prosecutor's opening address, the prosecutor shall make available to the defendant:

"(a) Any written or recorded statement, including any testimony before a grand jury, made by a person whom the

prosecutor intends to call as a witness at trial, and which relates to the subject matter of the witness's testimony".

After the jury was sworn, both before *and* after the prosecutor's opening address, the prosecutor expressed his intention to call Freddy Olivencia. Indeed, two witnesses had testified for the People before the problems relating to calling upon Mr. Olivencia to testify arose. The conclusion is inescapable, therefore, that the prosecutor violated the clear direction of CPL 240.45 (subd 1, par [a]), in not disclosing Mr. Olivencia's Grand Jury testimony after the jury was sworn and before his opening statement. The fact that Olivencia ultimately did not testify did not retroactively excuse the prosecution from complying with the statutory requirement. (Cf. *People v Rosario,* 9 NY2d 286.)

The People's position is that Olivencia's testimony was not exculpatory and therefore did not constitute material which should have been disclosed to the defense pursuant to *Brady v Maryland* (373 US 83) or *People v Rosario* (*supra*). However, when the prosecutor called Thomas Halley as the only eyewitness to the incident, to testify at the trial, he was aware of the testimony of Olivencia implicating Halley and his brother Martin. In spite of this knowledge, he kept this information from the defendant; he did not bring Mr. Olivencia's Grand Jury testimony to the attention of the defense and did not question Thomas Halley about Olivencia's statement. In fact on redirect examination of Mr. Halley, the prosecutor asked "How far were you standing *away* from Mr. Hopper and Mr. Lozado when Mr. Hopper stabbed him?" and received the answer "about four or five feet."

Had defense counsel been aware of Olivencia's testimony, his cross-examination of Halley might have been far different and perhaps more successful. In any event, the defense would assuredly have requested a charge to the jury as to the possibility of Thomas Halley having been an accomplice. (See *People v Santana,* 82 AD2d 784, affd 55 NY2d 673.) While the prosecutor brought Olivencia's Grand Jury testimony to the attention of the Trial Judge, this did not vitiate his responsibility to make the knowl-

edge available to the defendant for possible employment in his defense.

As the Court of Appeals recently stated in a case where the prosecution failed to disclose Grand Jury testimony of a police officer to a suppression court which had before it the inconsistent testimony of a parole officer: "It might well be that on further interrogation and clarification the versions of [police officer] and [parole officer] would be reconciled; however, because [the police officer's] testimony on its face is inconsistent with that adduced by the prosecution at the suppression hearing, its nondisclosure was fundamentally unfair to defendant." (*People v Geaslen,* 54 NY2d 510, 515; see, also, *People v Savvides,* 1 NY2d 554).

Technically, the prosecution may have steered a course which avoided the Scylla and Charybdis of both *Brady* and *Rosario (supra)*. Nonetheless, this conviction must founder since these cases are but discrete instances of the much more pervasive obligation of the State to accord a fair trial to one accused of a crime.

In the case at bar, the concept of a fair trial imposed a duty upon the prosecution and the court to apprise the defendant of evidence favorable to him, especially where such evidence was inconsistent with the testimony adduced by the People's sole eyewitness to the crime. "Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." (*Brady v Maryland, supra,* at p 87.)

Accordingly, the judgment of the Supreme Court, Bronx County (WARNER, J.), rendered February 15, 1980, convicting defendant after a jury trial, of murder in the second degree and criminal possession of a weapon in the fourth degree, and sentencing him to an indeterminate term of imprisonment of from 15 years to life on the murder conviction and to a concurrent one year term of imprisonment on the weapons conviction, should be reversed on the law and facts, and the matter remanded for a new trial.

CARRO, J. P., LUPIANO, SILVERMAN and BLOOM, JJ., concur.

198

Judgment, Supreme Court, Bronx County, rendered on February 15, 1980, unanimously reversed, on the law, and the facts, and the matter remanded for a new trial.